Thank you, and may it please the court and Mr. Reese, it's an honor to be here. My name is Sterling Threatt. I'm the attorney for Scott Bizar, the appellant and cross appellee. I'd like to try and reserve ten minutes for rebuttal. We'll see what happens. My client is asking this court to reverse the ruling on summary judgment in favor of Mr. Dee and Herman and instead to grant him summary judgment on his motion. As you know, the court in its capacity reviewing these motions de novo essentially steps into the shoes of the district court and evaluates the motions fresh. You have the opportunity to review the motions and the evidence provided in the statements of fact and the exhibits and so forth and determine whether you believe the decision is appropriate. As you review the record, you will see that my client provided essentially five bodies of evidence. First was his affidavit, and in that he described how he had been publishing versions of Villains and Vigilantes in various volumes from 1979 through the time of the case. He talked about his various volumes that were issued and his actions in that regard. Also in the second body of evidence would be royalty statements describing payments to Mr. Dee and Herman for their copyrights. Third would be actual copies of Villains and Vigilantes versions that are associated to Mr. Dee and Herman, either as an editor or an author or an artist. Fourth would be a body of these versions or volumes that had nothing to do with Mr. Dee and Mr. Herman. And then finally is a group of what I would call statements against interest by Mr. Dee or Mr. Herman where they acknowledge my client's trademark claims. There's a 1986 agreement where my client is identified as the owner of the trademark. There is a weblog in 1998 where he is acknowledged as the owner of the trademark and an acknowledgment also by Mr. Dee that they cannot take that away because they have no interest in the trademark. In 2000, a similar weblog entry. And finally in 2005, another one. So that is the body of the evidence my client submitted in connection with the motion for summary judgment. Now, standing alone, we believe that if you look at that evidence, it leads inevitably to the conclusion my client should win summary judgment on his trademark rights. And so Rule 56 requires a party who opposes or controverts that to come forward with admissible evidence, competent evidence that will contradict or, as the rule says, controvert that evidence that we have supplied in order to demonstrate that there is no justification for summary judgment. So then we look at the body of evidence offered by Mr. Dee and Herman. They provide two affidavits. Unfortunately, they have not listed any witnesses for trial. Discovery has closed. All the disclosures are made. No witnesses, but yet they provide two affidavits. They also provide two letters and then a copy of a 1979 contract. The affidavits, in addition to being inadmissible because they are for witnesses that are not listed, contain items for which they don't provide adequate foundation or basis for them to testify. And our position below and to you is that those affidavits should not be admissible for considering and controverting our motion. And I believe in the responsive brief by Mr. Dee and Herman, they seem to acknowledge that those affidavits probably weren't considered below and probably shouldn't be considered now. And we assert vigorously they should not be. So, therefore, we're back again at the body of evidence that my client supplied. And the body of evidence established that since 1979 forward, my client published numerous volumes containing villains and vigilantes as the trademark. It was published by his company and then later by himself personally. He's the one that funded the public. Kennedy. Well, but doesn't the 1979 contract say that when the company is dissolved, that's the end of it? You don't have any rights? They all revert to Dee and Herman? Well, I think Your Honor is probably referring to copyrights. With respect to the 1979 agreement, that addresses the 1979 publication. But the copyrights are separate and distinct from the trademark rights. Yes. And so the 1979 agreement covers copyright. But not trademark. Exactly. There's nothing in the agreement to reference or address trademark. And as I mentioned to you, the 1986 agreement with a third party clearly establishes that Dee and Herman have the copyrights, but that Bazaar has the trademark rights. So do whatever you will with the 1979 agreement. It may limit copyrights, but it does not limit the trademark that my client established. And over the course of time from 1979 through about 2010 or 11, he had published approximately 30 different volumes using that trademark, many of which do not involve Mr. Dee or Mr. Herman either as an author or an artist or an editor or any other format. So on the trademark question, the issue that seems to be at the center is the center is not whether you ever owned the trademark, but whether you abandoned the trademark. Right? I agree that that's what the district court evaluated. As I read the response to your briefs, they kind of take it in a different direction and seem to suggest perhaps that Dee and Herman own the trademark. There's simply no basis for that. But did they raise that ever in the district court, their ownership of the trademark? Never to my recollection. I've gone back and looked, and I don't see anything, any allegation in their complaint or in their motion. The argument in the motion for summary judgment was that it was abandoned in 1987 when my client stopped doing business in his corporate status. But as I said, after the corporation closed, my client continued to publish and to maintain those volumes in Commerce. And so the interests of the corporation devolved to him. He continued forward clear through 2010. And on the issue of abandonment, since you've raised that point, in the magistrate's decision below, he indicated that he appeared to believe that my client owned the trademark up until about 1990, I think is what he indicated. And then because he didn't see some royalty statements from 90 to 94, and because he didn't see some royalty statements from 1999 to 2003, I think, he concluded because there's those period of times where I don't see royalty statements, there must be abandonment. And in order for him to reach that conclusion, he had to completely reject my client's affidavit, which stated that he had continuously from 79 forward published. In the worst case, viewing the evidence in my client's favor, there is no reasonable way he could find summary judgment against my client. He would have to weigh that affidavit and determine that he did not believe my client's assertion. But moving beyond that, the other evidence corroborates. Sotomayor, I'm sorry. Go ahead. Which paragraphs of the affidavit are you relying on? I'm sorry. I don't have that in front of me, and I would have to dig through the record. But I believe you'll find that he does avow that he has continually done. In fact, both his affidavits, one in support of his motion and one in his response to the other motion. Did you have a question for me? Well, I mean, let's say that we agreed with you on this main point, but not to the extent that we were convinced that you, that your motion for summary judgment should have been granted, right? Because if I remember, these were cross motions on? I wouldn't necessarily call them that, but we can go on with your question. I mean, listen, I don't have any questions for you on this point. I think you're right, that there wasn't enough. Certainly, the record didn't allow entry of summary judgment against your client on this issue of ownership of the mark. But so does that then, that then means what? I'm trying to remember. Are there three claims that then would have to be sent back for further proceedings, presumably a trial? Okay. Well, if I'm following what you're asking me here, judgment should not have been entered against my client because he presented statements of fact. The question is whether or not judgment should have been entered in his favor. And that's what I'm doubting, exactly. Okay. And so now we look again at the body of evidence that was before the judge, and which is now before you, as you have stepped into the shoes, okay? And my question back, and this is rhetorical, what have you seen to controvert my client's affidavit where he says he continually did this? Yeah, and I guess that's what I started to ask, was that it's not enough that you just make some sort of de minimis use, you know, periodically just to preserve the mark, right? You've got to – I can't remember what the phrase is, but you're more familiar with it than I am. And I guess I didn't see evidence that there was, you know. Okay. As I understand the cases, my client cannot do acts simply for preservation of the mark if he's not in commerce. Right. Okay. I think that's really what you're getting at. Is he doing this just so he can hold the name and prevent someone else from getting it, or is he actually in commerce? And so my client – And I thought there was, perhaps, but you tell me if I'm wrong, a tribal issue at least as to that question. Correct. So then the next step is, is my client entitled to summary judgment based on what he presented? And I would take you back, again, to the universe of the evidence that you have. You have my client's affidavit that is uncontroverted. Now, we have royalty statements, and I grant you we have some gaps in those royalty statements, but my client explains part of that reason for it. First of all, in 1995 he had a problem where an employee destroyed some records, and you should find that in the affidavit as well, where everything from 1995 prior is completely lost, and we're relying upon Mr. D. and Herman to come forward and present us what they have. Unfortunately, they didn't present us what they had through that point, and so all we have is that block of records. And so there's that window of time my client can't produce. And remember, again, 1995, this is 15 years prior to the lawsuit. Could I ask a question on a slightly different topic if you've completed your answer to Judge Watford? I hadn't quite. Please finish. Okay. So that answers that portion. But in addition, I want to take you back again to the three statements of interest by Mr. D. and Herman. In 1988, supposedly just before he supposedly stopped doing it, they acknowledge he has it. In 2000, right in the midst of the time when he supposedly stopped publishing, Mr. Herman says, we can't do anything. He's still publishing. By the way, if you want to know how to do it. They're not lawyers, though, are they? I'm sorry? They're not lawyers, are they? Maybe not. But if a guy who has an interest says, I've talked to my lawyer, which is what he puts in his weblog, and I can't touch it because it's still in print. And, by the way, if you want to order a copy, here's how you get it. And this is in his weblogs. And then, again, in 2005, it's repeated. It's pretty far-fetched to suggest that multiple times he's saying, we don't have it because it's in print with Mr. Bazaar, and it's during the same timeframe, and he's not receiving any royalties or whatever else. So we submit that there's adequate evidence there. So I think that's my best answer to the abandonment. My question is whether the district court should have used New York law to deal with the State law claims of unfair competition and misappropriation. Okay. Well, if you're to this point, then I think you've already accepted my argument that we are the owners of the trademark. And so if you've accepted that argument, then the question is, why should State law apply? This is a tort claim. This is not the contract claim. The tort happened when my client had been in Arizona for 23 years. As of 1987, he's out of New York. Dee and Herman are not related to New York. The fact that there's a contract with a copyright issue in New York doesn't mean that a tort claim lies within the State of New York, simply because it's the same parties. I haven't seen any law that suggests that that would be the case. Now, if this was strictly the breach of contract claim, I would agree New York law should apply interpretation to that contract. But as to the tort, I submit it does not. And I'm down to 7 minutes. If you don't mind, I'll sit down and rebut what comes. I think that's okay. Thank you. Nobody has an immediate question. Go ahead. May it please the Court, my name is Alex Reese, and I represent the appellees and cross appellants Jeffrey Dee and Jack Herman. We're here this morning to talk about three consolidated appeals that arise from a dispute over who owns the rights to a role-playing game that my clients created called Villains and Vigilantes. I thought it would be helpful to begin just with a quick roadmap of each of those three appeals and the issues involved with them before discussing some of those issues in more detail. You may run out of time. You have a lot of ground to cover. It is complicated, Your Honor, I admit it. I'll do my best to get through it quickly. So the first appeal is number 12-17826. And there my clients appeal the entry of a default judgment and damages award against them relating to Mr. Bazar's defamation claims. The district court abused its discretion in entering the default judgment, and the damages award was clearly erroneous. And we ask... On the entry of default judgment, so what's the meritorious defense that you claim you staked out? The one that was raised most clearly in my client's motion to set aside the default was lack of personal jurisdiction. But as to the, if I remember, it's the two claims of defamation and commercial disparagement? That's correct. And I guess I just didn't see how that had any chance of winning, under our case law at least, provided that your clients knew that Mr. Bazar was in Arizona. And was there some indication of that in the record? How they would win on the personal jurisdiction defense? Well, yeah, I'll break it down. So if they know that he lives in Arizona and they defame him, our cases say that that's enough for you to, you know, basically have directed your activities toward the form of state. That's how I read our Washington Shoe case. There's a couple of others. But the defendant certainly has to know that the plaintiff is located there. And I wasn't sure if there was evidence that your clients knew that Mr. Bazar had relocated to Arizona. Well, first of all, I think we would disagree with that understanding of the case law. And the nuance here is that these statements were supposedly made online. And in the Internet context, the personal jurisdiction analysis is somewhat different than some of the traditional analyses that are applied in the cases cited in Mr. Bazar's brief. In particular, there are several cases in the circuit holding that simple knowledge of where the victim of the statements lives is not sufficient to establish personal jurisdiction over the person who supposedly made the statement online. There's another issue that occurs to me with respect to the question of personal jurisdiction, and it relates back to your saying there's a whole bundle of these cases. There was another case that had been filed and had already been transferred to Arizona by the time you filed your motion to set aside the default. And in that other action, you did not object to the transfer to Arizona. You had appeared at scheduling conferences and basically had there been several things that had happened in the other litigation that involved the same parties and essentially the same transactions where you had appeared without arguing about jurisdiction. So why isn't that enough to waive any objection to personal jurisdiction? So the timeline here is a little bit complicated, so if I could just walk through that quickly. This whole litigation began when my clients filed suit in Florida, as Your Honor noted. That was in July 2011. Mr. Bazar moved to transfer the case to Arizona, and you're correct that my clients did not oppose that motion. He then filed his own affirmative case in Arizona in October of 2011. So at this time, there's the case in Florida and there's the case in Arizona. And the Florida case was transferred, and it had proceedings that went on before the date that you filed your motion. Well, the only proceedings were that our Florida counsel, my client's Florida counsel, did enter a motion for pro hoc vicee in the separate lawsuit that they had filed in Florida, which was then transferred to Arizona. So two separate cases still at that time. Very shortly thereafter, the default was taken, and my clients contested personal jurisdiction in their very first motion appearing in Arizona. In this case, the companion case involving the same transactions, the same people, they had not objected to personal jurisdiction. That's correct. So why isn't that a waiver as to this intimately related matter? So I think the answer, Your Honor, is that the personal jurisdiction analysis occurs at the time the complaint is filed, and actually more precisely, as of the time the actions that are complained of in the complaint occurred. So we could only look at contacts with the forum state, my client's contacts. But that has nothing to do with waiver. It's a waivable defense. And you can, whatever the complaint says, you can come in a month later and say, no problem, we waive it. So when you're looking at waiver, it really isn't about what you could have argued had you not waived it. Sure. Okay. Well, so then the question is, was the fact that my client's Florida counsel entered, didn't contest personal jurisdiction in a completely separate case and entered a motion for pro hoc vicee, was that enough to waive their personal jurisdiction defense in a completely separate case? And the cases that I've seen cited in Mr. Bazar's briefing, none of them have similar facts like that. They all involve a party who tried, who affirmatively sought relief in the same forum, either through a counterclaim or by filing a motion to dismiss or something of that nature. Here, my clients filed a suit in Florida, and they didn't contest the transfer. That's correct. But the mere fact that their attorney filed a motion for pro hoc vicee. But that's not the only thing that happened. There was a motion to consolidate the two actions that I think happened before the motion to set aside the default, or the motion about personal jurisdiction. I don't believe that's correct. And I could be wrong, but the way that I have it. Check the timeline again. Say again? I will check the timeline again, but would that have any effect on the analysis? Would it have any effect whether they. Yes, if your clients affirmatively requested that the action that they had not objected to having transferred to Arizona be consolidated with this other action. I think that once the cases were consolidated and my clients began litigating in the same case, then the argument for waiver is much stronger and it relates more closely to the fact pattern seen in the cases cited by Mr. Bazar. I believe the motion by Dean Herman to consolidate was filed on March 6, 2012. Your motion to set aside the default was in January. Yes. Two months earlier, or a month and a half earlier, and the case was transferred back in November. So the motion to consolidate was in March. Correct. If that matters. Right. So their motion to set aside and their argument that the court. Cases were consolidated in April. Yes. So their motion to set aside and their argument about personal jurisdiction came before the consolidation. Okay. So just go back to my, I'm wrong on a law, you said, and I'd like to hear a little bit more. Sure. Sure. So some of the cases cited in our briefing discuss defamation claims in the context of statements made online. And I think probably our best case here, if you look at Mueller versus GMAC mortgage, which is an unpublished case, I can give you the Lexis citation if you'd like. Unpublished? I'm probably not going to look at it, to be honest. It's published on Lexis. We have published authority that deals, I thought, with Internet-related activities, but maybe you're telling me I'm wrong and that the cases I'm thinking of are traditional defamation cases? The cases that I've seen in the briefing, they either are defamation claims that are not, where the statement was not made online, or the cases that we cite. Why does it matter whether the statement's made online or not if the defendant knows that the plaintiff resides in a particular State and does all it can, all he or she can to destroy that person's reputation? Why? I thought our cases were very clear that, yeah, that's directing, purposely directing your activities at the form State. That's enough, not for general personal jurisdiction, but for specific as to those claims. Well, all I can say is it seems that the courts have struck a different balance for statements made online. And there's a reference in one of the cases we cited to why that might be the case. And this is, luckily, a published case. Eccentric Ventures v. Bird, a District Court of Arizona case published at 683 F. Supp. 2nd, 1068. And there the court says basically that asserting personal jurisdiction that broadly for statements made online could chill free speech. And I think that's a reasonable reason to distinguish between, for example, one of the cases cited in Mr. Bazar's briefing, Brainerd, where it was a letter sent to the forum State, phone calls to the forum State, in which the defendant talked with the victim's employer. That's very different than somebody making a statement, you know, 10 States away online, which could be read by anybody. And those cases that we've cited hold that merely knowing where the subject of the statement resides is not sufficient. What's the something else you have to do? You have to send material into the forum State? You have to... In the context... Sorry to interrupt. No, no, go ahead. In the context of the Internet, yes, the statement has to be directed toward the forum or somehow call attention to residents in the forum that it's targeted toward them. So here again, I'm quoting Mueller v. GMAC Mortgage, District Court of Arizona case, and I'm quoting, unless a website has unique ties to a particular forum or the content of the offensive comment is somehow forum-specific, there's no personal jurisdiction. The content of the allegedly defamatory communication is forum-specific? Is that what you... That's from the District Court, yes. Well, that sort of begs the question about whether if the content is specifically about a person in the jurisdiction, whether that counts as content-specific. And here the court found that it was not enough, that in that particular case, the statements were actually made on the plaintiff's own website. The defendant went onto the plaintiff's website and left a supposedly defamatory comment on the plaintiff's website, and that was not sufficient. Even a website hosted by the plaintiff, and the defendant knew where the plaintiff resided. So that still was not sufficient. So clearly we're spending a lot of time on personal jurisdiction. You've got other issues. You should move on. Well, my clients also contest whether they even made the statements, and I'd be remiss if I didn't note that, which would also be a meritorious defense. But you've got bigger fish to fry than, like, $53,000 in this case. Well, for my clients, that actually is the premier issue. It's actually the judgment against them. They are limited means. So if there's one thing that I can convince you on, I want to convince you to vacate the default. Could I ask a question that I hope both counsel will address? And this case strikes me, there's a lot of emotional content to what's happened between these parties. Have the parties considered or have they tried using the mediation services that our court offers to resolve this case, which is, after all, ultimately about money? It was not trial counsel, and I unfortunately got involved in a somewhat later stage in the appeal. So Mr. Threep may have a better sense of whether the extent to which we've engaged in. No, no, when you come back. It's just a thought. If you have made efforts and they have failed, that's great. That's what we're here for. But if you haven't, we can always allow the parties time to consider that option. Sure. So continuing with the default for just a couple more minutes, and then there are larger issues. But even if there was personal jurisdiction, the default was still improper under the Falk v. Allen test. That's a Ninth Circuit case published at 739 F. 2nd 461. My clients litigated the entire default proceedings pro se. And under that three-part test, there was no culpable conduct on their part. They had meritorious defenses, as we've discussed. And setting aside the default would not have prejudiced Mr. Bazar. So we still believe the default was improper, even if there was personal jurisdiction. And then the last point I'd make about the default is, even if it was proper under the Falk v. Allen, our next fallback argument is that it should still fail for a failure of proof. If you look at the complaint that Mr. Bazar filed in this action, there's no allegation that my clients knew the statements were false. And that's an essential element of both the claims on which they were defaulted. So the court can only accept as true on default what's alleged in the complaint. The complaint failed to allege an essential element. So moving on to the second appeal, which is 13-15361, that's the appeal that Mr. Threatt addressed in which Mr. Bazar appeals the district court's summary judgment ruling. And the district court granted summary judgment in my client's favor, both on their copyright infringement claims against Mr. Bazar and on Mr. Bazar's unfair competition claims against my clients. The standard of review here is de novo. And we'd submit that the court should affirm in all respects. As to the copyright claims, my clients created this game. They created villains and vigilantes. And under that 1979 contract, which came up during counsel's opening argument, they retained all rights to the game except for those that were explicitly granted to Mr. Bazar's former company called Fantasy Games Unlimited, Inc. There was also, I believe one of your honors referred to this, there was a reverter in that contract that if Mr. Bazar's former company ceased doing business for any reason, all rights would revert back to my clients. Presumably all rights would include the trademark to the name Villains and Vigilantes. He says that the 1979 agreement does relate to copyright but doesn't relate to trademark. Yes. And I don't know where that comes from. There's nothing in the argument to – excuse me, there's nothing in the contract to suggest that it's limited to copyrights. There's a fairly specific provision that I jotted down. This appears at excerpts of record 406, paragraph 14 of the 1979 contract. All rights not explicitly given to Fantasy Games Unlimited in the contract are reserved to my clients. What paragraph are you reading from? I'm sorry. Paragraph 14 at ER 406. And earlier in the contract, the only rights that my clients granted to Fantasy Games Unlimited, Inc., was publication and distribution rights. They didn't grant any intellectual property rights whatsoever to the company. Did your clients use the mark in commerce? They began using the mark in commerce in 2010. Yeah, that's late in the game. I'm talking about during the period that we're focused on here. So their contract with Fantasy Games Unlimited in 1979 would be considered a use in commerce because they were licensing the mark to the publishing house. So it's analogous to a manufacturer-distributor relationship. The 1979 contract was the very first use in commerce, the publication agreement. And then, obviously, it was used in commerce by their distributor many times in the subsequent years. I mean, it seems at best there's just a disputed issue on the question of who might have owned it, right? I mean, as I've indicated to your opponent, I sort of am not inclined to think that they are entitled to summary judgment, but I certainly don't think that your client was entitled to summary judgment on these claims. So I think the issue here is these were Mr. Bizarre's affirmative trademark infringement claims, and it was therefore his burden to come forward with evidence proving his ownership. We have to start with the presumption that my clients owned the trademark to begin with. They created the game. It was their idea. They owned all the rights to it from the beginning. They had a publication and distribution agreement with Mr. Bizarre's former company that did not grant Mr. Bizarre himself any rights. But he was, I mean, tell me if I'm wrong on this. I thought the evidence was undisputed that he most certainly was using the mark on works that had nothing that, you know, for which your clients had no involvement, basically. And, you know, I mean, so whether your clients were asserting ownership or not, I mean, he started using it for at least some periods. Now, you might argue that, well, he abandoned it at this point. But there are definitely periods where he was using the mark and acquired ownership rights, right? I would dispute whether he acquired ownership rights. If the question you're asking is did my clients own the mark to begin with and then lose it because he started using it, his use was all under the knowledge that the mark was theirs to begin with. So I don't think that he could have acquired the right to the trademark knowing that his only right to distribute the game. Excuse me. Thank you very much. While you're taking a sip of water. Maybe the dispute resolution procedures would be effective. The ownership question. The district judge thought that Bizarre owned the trademark, didn't he? But from 1999 to 2004 and then abandoned it. The question of whether your clients owned the trademark was not addressed by you or by the district court in the proceedings below, right? Right. So this would be an alternative grounds on which you could affirm the district court's ruling. And just to clarify one thing about what your Honor said, the district court never found that Mr. Bizarre actually owned the mark. It found that even if he owned the mark, he abandoned it. So it never reached the issue of his ownership and how he could acquire such to distribute and publish, how he could then go acquire the mark simply through use. I don't know how it would work. So clearly I'm out of time here. The last issue was the Rule 59. My clients have a statutory right to damages for the copyright infringement that the court said Mr. Bizarre engaged in. And so I don't even remember in your summary judgment paper, not your, but your client's summary judgment papers. I don't even remember a request for any award of statutory damages. I thought that was really the defect procedurally in the way this case is coming to us is that your client's former lawyer perhaps, you know, should have done more to assert affirmatively that, hey, if you rule for us as the court did on our copyright infringement claims, we want at least the statutory damages and perhaps something more. And there was just no mention, no, you know what I'm saying? And so, and then, yeah, you try kind of late in the day to move for reconsideration and the court, I think, rightly was skeptical. You could have asked for this earlier. I'm not considering this now. It's too late. I agree with you that it would have been ideal if the summary judgment motion had included a request for damages. And I see I'm over my time, but I'll just answer your question. There are often motions for summary judgment that only go to the liability question and reserve the remedy question to later. Your complaint asked for both damages and injunctive relief. Yes. So were those remedy requests reserved for later or just waived or abandoned? My client certainly did not intend to waive them or intend to argue that they were not entitled to damages. And, Your Honor, you're correct that the complaint asks for both damages and statutory damages in particular, and my clients raised that issue again in their Rule 59 briefing. I don't think so. I remember looking at that and being quite startled to see a request. Tell me if I'm wrong. I thought they were basically saying, look, what we really want is just give us enough damages to offset the amount of the default judgment and we'll call it a day, and then presented no evidence to substantiate the $52,000 figure. I don't remember there being any request, even in the motion for reconsideration, for an award of statutory damages in X amount. Am I wrong on that? I agree that there was no amount listed, but they did refer in their Rule 59 briefing and it may have been in the reply papers to statutory — to their entitlement to statutory damages. And I think what Your Honor is getting at on this issue is the Rule 59 request, it could have been stated more clearly, and I think the district court misinterpreted it as a request that the $52,000 judgment against us simply be transferred over to us. And that is — that's not what my clients requested. In their opening brief on the Rule 59 motion, they said there's a lot of evidence of damages in this record already, for example. And then they listed some of the elements of the damages that make up the $52,000, some of which relate to Mr. Bazar's infringing sales. And they generically then say that these and other forms of damages are owed to us or something along those lines. It's not very specific, but. I agree with that. But I'd go back and say liability and damages don't have to be resolved all at the same time. And they have a statutory right, at least to statutory damages under the Copyright Act. There's simply no reason that they shouldn't be able to obtain damages for Mr. Bazar's infringement, especially with a record like this one that contains quite a bit of evidence of his infringing sales and the profits he made from those sales. So what's the amount of statutory damages that the — I'm looking at now at the motion for reconsideration, and it does — definitely does not state a figure. So what's the figure that should have been obvious to the Court as to how much in statutory damages your clients were requesting? I think it would have to go back. There would have to be an evidence. Well, that's what I'm saying. And that was the burden your clients had at this point in time if you wanted to tell the district court that it had erred and needed to fix it. It seems to me more than what's said here. Wherefore, defendants — I'm sorry. These and other damages may now be awardable to defendants. D. Herman and Monkey, House Games, Inc. That's the last catch-all request that I think you're referring to. I mean, I don't know. It seems hard to fault the — especially given that our review here is for abuse of discretion. That's all you gave the district court, and we're supposed to say it was an abuse  in damages? I'm fairly certain that the review on a denial of a Rule 59 motion is clear error, not abuse of discretion. But so, I mean, that's for factual findings. But anyway, we owe some deference to the district court at this point. Certainly. Certainly. So, you know, again, I'm not going to tell you that there was a very specific dollar amount request in the Rule 59 briefing. There was a request to present evidence of damages, and to — Well, you did in the reply, I think, mention the figure of $85,000 as being the minimum that was demonstrable from what had been presented earlier. Yes. I believe that's correct. Your Honor has a better memory of that briefing than I do. I think you've exceeded your time, and I understand your position. Yes, I have. And, Mr. Threatt, you have some rebuttal time remaining. Thank you very much, Your Honors. Thank you. I'm really wishing I had my 10 minutes. Just a couple of things. First of all, facts that were not included in this discussion about whether or not the Rule 59 motion should be granted. Our motion for summary judgment specifically alleged they could not prove damages. They had not disclosed any. They had not disclosed any damage witnesses, no experts, nothing. We asserted that in our motion for summary judgment, and there was no response to that motion. So the judge had that in front of him on the motion for summary judgment. Nothing offered by Mr. D. Herman. His decision was not an abuse of discretion based on that context. Next thing, to correct the record, one cannot trademark the title to a single book. It can't be done. Therefore, the 1979 book could not be trademarked. Trademark rights could not be established or agreed upon in that contract. It's only by a succession of publications of books that you can create a trademark in a series of books, and we cite the authority in our brief. So it takes a series of books in order to create a trademark in the name of the series. My client did that. They did not. The suggestion you should start with the assumption that they owned a trademark is unsupported by the record and by the law. Only by my client continually publishing numerous, and the brief addressed approximately 30 different volumes that my client published to create that trademark. Nothing published by Mr. D. or Mr. Herman. And nothing in the record contradicts that. Those are the facts in this case. Okay. Jurisdiction. I would disagree with counsel that there is a different test to be applied merely because there's some kind of publication on the Internet as opposed to other situations. The test is the same. However, you look at things a little different when you have some type of Internet posting or web blog. The problem is this. We're not talking about generically. We're talking about what was in front of the judge as of the time he was considering their motion to set aside the default judgment. And so at that time, there was no evidentiary hearing. There were no affidavits. There was no development of the facts in any way, which means the only thing the judge had in front of him was my client's complaint and their motion to set aside the default. In their motion to set aside, they assert two facts. Number one, they don't live in Arizona. Number two, they don't own any property in Arizona. They do not assert any other facts. So then we look back to the complaint. And when the court is determining whether my client has met the burden on jurisdiction, the court is to assume that the allegations of the complaint are true, which means the facts to support my client allege are there somewhere to prove it. I don't have to worry about that, do I? The facts next to it are there. So if you look at the complaint, does the complaint allege sufficiently to establish? Well, the ‑‑ let's see. It's the Lake decision, I believe, that talks about ‑‑ yes, the Lake decision from this Court talks about purposefully directing to the State. So the question is, does the complaint allege a purposefully directing of these defamatory comments to the State? My client's complaint alleges that. I don't have it in front of me, so what does it say? Or what specifically are you referring to in the complaint? In our complaint, paragraphs 7 and 8 assert that each of the specific allegations of the complaint were done purposefully directed at my client in Arizona. And so that's my client's assertion. And if we look at that complaint, that's ‑‑ It doesn't use the word purposely, but it does say the actions alleged herein were directed at plaintiff within this State. And this Court has jurisdiction. The second one says the court has venue for the same reason. My apology if I misspoke on that. That's okay. But the allegation of the complaint is that these things were directed to the State. How do you direct something out of State when you post it on the Internet? Well, Your Honor, what you have to do sitting here determining de novo for jurisdiction, could facts be presented to support that complaint? And if facts could be supported, then you must accept this allegation of the complaint as being correct. Because, again, as I said, there was no evidentiary hearing. There was no development of the facts beyond it. So we look at the complaint and say, does it facially allege sufficient for jurisdiction? Had there not been a default judgment, then the defendants could have come in and moved to dismiss for lack of personal jurisdiction, and the issue would have been joined, and all of this kind of discussion we're having now would have been developed, right? Presumably. And presumably, they could have attached affidavits that raise specific points. They could have brought these things forward or asked for an evidentiary hearing, I suppose. But we don't have that. We just have the paperwork, and the paperwork is assumed to be true. And you must assume that put to the test, my client could bring forward the witnesses, the affidavits, the evidence, and so forth, to establish that that was the case. Now, I understand we're talking about this in a vacuum, but that's the element that that is the standard you're looking at here in this particular situation. If you look at each of the cases. What about, okay, I mean, I think I got your point on that, but what about his backup argument, which is that they did finally assert, I can't remember exactly when in the That would seem to be a meritorious defense if, in fact, they were able to prove that. In our cases, you set a fairly low bar at the terms of default judgment, right? The problem with that is in their motion to set aside, they didn't assert that. That's why I couldn't remember when they did. I do remember them finally asserting that, but you're saying when did that happen? I think what you're referring to is facts generated on appeal by counsel, because nothing in the motion to set aside raises those facts, nothing, to suggest that it could defeat it. And as far as meritorious defense, the answer that they give or the statement they make is we dispute everything. That doesn't give anything for the judge to sink his teeth into and say, yeah, you know, you're right. This is really something we need to fight over. They don't present any meritorious defense. And the test, going back, you know, to the motion to dismiss is a disjunctive test. Is there, you know, is there culpable conduct? Is there meritorious defense? Is there whatever? They don't meet that standard. And so the judge was well within his discretion to deny their motion. But, you know, viewed more importantly, is there jurisdiction? There is, based on the complaint. And of course, as Judge Graber referenced in her questions, certainly there is waiver after the fact. I mean, we can't accept counsel's position that when you have same parties, same judge, same forum, same basic issues, all in the same context, that they haven't waived that jurisdictional place. Did you want to say anything at all about our court mediation program? You don't have to, but I want to give you the opportunity, even though your time has expired. My clients mediated with Mr. D. and Herman prior to me actually filing the motion for summary judgment, right about the time of the motion. We had a definite impasse. We were invited to go through the mediation again by the court staff, which, by the way, this is an excellent court staff. They've been wonderful to work with. But at that point, in speaking with opposing counsel, they did not believe it would lead to any different result than we had. That's fine. That's what we're here for. We appreciate the invitation. That was in the district court mediation or here? Here. The actual, the mediation. No, in terms of court staff you were referring to that you talked to me about with mediation. The court staff here at the court of appeals. Okay. Yes. Okay. Thank you. Thank you, counsel. The case just argued as submitted. And, again, we appreciate very much the arguments of both parties. We are adjourned for this morning's session. All rise.
judges: Friedman, Graber, Watford